FILED

2026 Jul-16  AM 09:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **PAULA SIMMONS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **7:25-cv-711-EGL** |
| | ) | |
| **FRANK BISIGNANO,** | ) | |
| ***Commissioner of*** | ) | |
| ***Social Security,*** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Paula Simmons seeks judicial review of the Commissioner of Social Security's denial of her applications for disability insurance benefits and supplemental security income. *See* Doc. 9 at 1. Simmons argues that substantial evidence does not support the Administrative Law Judge's (ALJ) residual functional capacity determination because the ALJ failed to include, or otherwise mischaracterized, limitations identified by her treating chiropractor, an examining physician, and an examining specialist. *Id.* at 2. After careful review of the administrative record and the parties' briefs, the Court **AFFIRMS** the Commissioner's decision.

## BACKGROUND

### A. Procedural Background

Simmons filed applications for a period of disability, disability insurance benefits, and supplemental security income on January 21, 2022, alleging that her disability began on November 30, 2021. *See* Doc. 9 at 1; Doc. 12 at 1. The agency denied her claims initially on October 27, 2022, Doc. 6-5 at 28-37, and again on reconsideration on September 1, 2023, *id.* at 40-47. Simmons requested a hearing, and, on March 13, 2024, she appeared with counsel and testified by telephone before an ALJ; an impartial vocational expert also testified. Doc. 6-3 at 37-58. On May 21, 2024, the ALJ issued a decision finding that Simmons was not disabled. *Id.* at 9-24.

On April 21, 2025, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. *Id.* at 1-8. Simmons then filed this action. Doc. 1. She has exhausted her administrative remedies, and the Court has jurisdiction under 42 U.S.C. §§ 405(g), 1383(c)(3).

### B. Factual Background

Simmons alleged disability based on a condition affecting both legs, a back condition, depression, anxiety, chronic fatigue, and morbid obesity. Doc. 6-8 at 6. She was fifty-four years old on the alleged onset date, has an eleventh-grade education, and has past work in customer service and as a cook. *Id.* at 2, 7; Doc. 6-3 at 47-53.

At the hearing, Simmons testified that she must use a rollator to walk, that injections relieve her pain for only a few days, and that the more active she is, the more she hurts. Doc. 6-3 at 38-47. She estimated that she could walk 100 feet with her walker, stand for up to ten minutes, and sit for about ten minutes; and she stated that she elevates her feet twice a day to prevent swelling. *Id.* at 44-45. She described significant sensitivity in her legs from vein problems and said she tried to do chores but cannot help much. *Id.* at 45-48. In her function reports, she alleged that she cannot stand for long periods of time because of swelling, can walk only short distances, used a cane, and could lift about five pounds. Doc. 6-8 at 49-52.

## ALJ DECISION

To determine whether a claimant is disabled, an ALJ applies a five-step sequential evaluation process, asking whether the claimant (1) is engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals the severity of a listed impairment; (4) can perform any past relevant work; and, if not, (5) can adjust to other work that exists in significant numbers in the national economy. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

At step one, the ALJ found that Simmons had not engaged in substantial gainful activity since November 30, 2021. Doc. 6-3 at 14. At step two, the ALJ found that Simmons had two severe impairments: morbid obesity and varicose veins of the

3

bilateral lower extremity. *Id.* At step three, the ALJ concluded that none of Simmons's impairments, alone or in combination, met or medically equaled a listed impairment. *Id.* at 15.

The ALJ then assessed Simmons's residual functional capacity (RFC). Applying the two-step framework of 20 C.F.R. §§ 404.1529 and 416.929 and Social Security Ruling 16-3p, the ALJ found that Simmons's impairments could reasonably be expected to cause some of her alleged symptoms, but that her statements about the intensity, persistence, and limiting effects of those symptoms were "not entirely consistent with the medical evidence and other evidence in the record." Doc. 6-3 at 15-16. After considering the entire record, the ALJ found that Simmons could perform light work, except that she can frequently climb ramps and stairs, but should avoid ladders, ropes, and scaffolds. *Id.* at 15-18.

At step four, relying on the vocational expert's testimony, the ALJ found that Simmons could perform her past relevant work in customer service (DOT 279.357-054, light, SVP 3), both as she actually performed it and as it is generally performed. *Id.* at 18-19. The ALJ noted that Simmons had also worked as a cook (DOT 313.361-014, medium, SVP 7), but the vocational expert testified that the RFC precludes that job. *Id.* at 19. The ALJ therefore concluded that Simmons had not been disabled under the Social Security Act from November 30, 2021, through the date of the decision. *Id.*

4

## STANDARD OF REVIEW

Judicial review under the Social Security Act is narrow. The Court asks only whether substantial evidence supports the Commissioner's decision and whether it rests on the correct legal standards. *Winschel*, 631 F.3d at 1178. "[W]hatever the meaning of 'substantial' in other contexts," in the context of judicial review of social security decisions, the threshold "is not high." *Biestek v. Berryhill,* 587 U.S. 97, 103 (2019). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015).

Under this standard, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for the Commissioner's. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Even if the evidence preponderates against the Commissioner's findings, the Court must affirm if substantial evidence supports them. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158-59 (11th Cir. 2004).

## DISCUSSION

Simmons raises one claim: that substantial evidence does not support the ALJ's RFC determination because it "failed to include the limitations identified by the treating chiropractor, the examining physician, and the examining specialist, whose opinion was mischaracterized by the ALJ." Doc. 9 at 2. Those sources are, respectively, chiropractor Tammy Moore, D.C.; consultative examiner Dr. Remona

5

Peterson; and Dr. Marc Passman of the UAB Vein Clinic. *Id.* at 6-12. The Court first explains why the RFC rests on substantial evidence and then addresses each of Simmons's objections. None warrants reversal.

## I.    RFC Determination

A claimant's RFC is the most she can do in a work setting despite her impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). The ALJ assesses it from all the relevant evidence, including medical history, laboratory findings, the effects of treatment, daily activities, and medical opinions. *Id.*; SSR 96-8p, 1996 WL 374184, at *5 (S.S.A. 1996). That assessment belongs to the ALJ at the hearing level, 20 C.F.R. §§ 404.1546(c), 416.946(c), because "the task of determining a claimant's [RFC] and ability to work is within the province of the ALJ, not of doctors," *Robinson v. Astrue*, 365 F. App'x 993, 999 (11th Cir. 2010). The ALJ need not discuss every piece of evidence, but he must consider the record as a whole and state the grounds for his decision with enough clarity to permit meaningful review. *Mitchell v. Comm'r of Soc. Sec.*, 771 F.3d 780, 782 (11th Cir. 2014); *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981).

The ALJ's decision reflects that kind of review. He began with a comprehensive review of Simmons's medical history, starting with Simmons's varicose veins dating back to around 1980, and car accidents in 2017 and 2018, after which imaging showed mild degenerative changes but nothing acute. Doc. 6-3 at 16;

6

Doc. 6-9 at 2-81. After a third car accident in 2020, Simmons complained of cervical tenderness, but her cervical imaging was normal and she had normal sensation and strength. Doc. 6-3 at 16; Doc. 6-10 at 2-14.

The ALJ then traced Simmons's treatment at Maude Whatley Health Center beginning in late 2021. Doc. 6-3 at 16. Although she reported that her lower extremities were weak and would give out, she had no gait or range-of-motion problems around the alleged onset date and only had lumbar tenderness with moderate pain on range of motion. Doc. 6-9 at 73-81. In early 2022, she had some lumbar weakness and pain, but she kept a normal gait and acknowledged that medication had improved her symptoms. *Id.* at 69-72. In February 2022, she limped at times but needed no assistive device; she had some varicose veins; and, because she was obese, her providers advised weight loss to relieve her symptoms. *Id.* at 65-68. Knee imaging in April 2022 showed only minimal degenerative disease. *Id.* at 81. She continued to report back pain, received ibuprofen and a Toradol injection, was again encouraged to lose weight, and was referred to a chiropractor. *Id.* at 55-64.

The ALJ then reviewed Simmons's chiropractic intake records, Doc. 6-3 at 16, which showed that Simmons arrived using a walker seat and that "[s]he is trying for disability due to her back pain." Doc. 6-10 at 27. On examination, she had some lumbar tenderness but normal range of motion and normal reflexes. Doc. 6-3 at 16;

Doc. 6-10 at 27-35. And, as the ALJ observed, Simmons's primary care records to that point did not show she used any assistive device. Doc. 6-3 at 16.

In July 2022, Simmons presented to Dr. Remona Peterson for a consultative examination and reported that she needed a rollator to walk. *Id.*; Doc. 6-10 at 20. On examination, she had positive straight-leg raising, back tenderness, mild ankle edema, and varicose veins, and she needed help on and off the table. Doc. 6-10 at 20-22. But her reflexes, sensation, and muscle bulk and tone were normal, though Dr. Peterson noted some reduced strength in her hips, quadriceps, hamstrings, knees, and ankles. *Id.* Dr. Peterson diagnosed her with chronic low back pain and lower-extremity instability. *Id.* at 22. She opined that Simmons could not perform "quick, intricate movements" given her limited range of motion, muscle strength, and dexterity, and that her conditions have a major impact on her activities of daily living. *Id.* The ALJ found this opinion "only somewhat persuasive" because it offered no function-by-function assessment and framed Simmons's limits in terms not defined in the Dictionary of Occupational Titles, and he explained that "[g]iven the overall normal imaging, persistently conservative treatment, and unremarkable examinations, a limitation to light work is well supported." Doc. 6-3 at 16-17.

Later evidence, the ALJ found, told the same story. *Id.* An August 2022 MRI of the lumbar spine showed only mild discogenic degenerative changes at L5, with no impingement. Doc. 6-10 at 49-53. Chiropractic records from September 2022

showed that adjustments reduced Simmons's pain from nine to two on a ten-point scale; she could bend and flex without pain, stand without leaning or bracing, and sleep well, waking without pain. Doc. 6-11 at 8-15. Imaging of her hips showed only mild degenerative joint disease. *Id.* at 105.

Records from 2023 continued to support the assessment. At the UAB Vein Clinic in March 2023, Simmons had bilateral varicose veins, limped, was observed hobbling, and reported that she could not tolerate any touching of her legs; yet she had normal pulses, range of motion, strength, sensation, and motor function. *Id.* at 21-30. She was diagnosed with bilateral lower-extremity swelling, pain, and lymphedema; fitted with compression hose to wear all day; told she could elevate her legs twice per day with active range of motion of her ankles and feet; and again advised to lose weight. *Id.* at 26. Testing was negative for deep and superficial vein thrombosis. *Id.* at 28.

In July 2023, after Simmons fell in a grocery store, emergency department imaging showed minimal degenerative changes in her hips and only mild multilevel facet degenerative changes in her lumbar spine, with no acute abnormality. *Id.* at 34-38, 67-68. She had full range of motion, and the hospital gave her a work excuse stating that she could return to work the next day. *Id.* at 43, 64. She told providers that she did not use an assistive device at home, and staff noted that she was capable of standing, transferring, walking, sitting, and maintaining balance without

9

difficulty; she was also not considered a high fall risk. *Id.* at 46-53. Later that month, her nurse practitioner noted normal range of motion and recommended a knee brace as needed, along with rest, ice, compression, and elevation. *Id.* at 85-87. When Simmons returned a few months later reporting worsening pain, imaging was recommended, but she declined; her cervical back examination was normal, though she had some decreased lumbar range of motion. *Id.* at 82-84. By December 2023, her range of motion was normal. *Id.* at 93-95.

In 2024, Simmons complained of worsening back and leg pain, said she could not sit or stand for longer than thirty minutes, and received an injection. *Id.* at 112-18. In the most recent record, she reported that her back pain had occurred only occasionally over the past six years, and her chiropractor recommended home exercises and stretches. *Id.* at 119-21.

The ALJ also evaluated Simmons's obesity under Social Security Ruling 19-2p, which requires him to consider its limiting effects in assessing the RFC. Doc. 6-3 at 18. He explained that her imaging had been "minimal to mild" and offered no explanation for her use of an assistive device or other significant limitations; that her treatment had been conservative; that no acceptable medical source had prescribed an assistive device; that Dr. Peterson did not find one medically necessary; and that Simmons herself had said she did not use one. *Id.* Accounting for her morbid obesity and her history of varicose veins, the ALJ limited Simmons to light work, and to

10

accommodate potential fluctuations in her pain or range of motion, he directed that she avoid ladders, ropes, and scaffolds. *Id.*

Finally, the ALJ considered the findings of the State agency medical consultants, Dr. Krishna Reddy and Dr. Gloria Sellman, who reviewed the record at the initial and reconsideration levels and opined that Simmons could perform a range of medium work. *Id.*; *see generally* Doc. 6-4 at 4-17, 20-29. The ALJ found those opinions "only somewhat persuasive" because the record, including Simmons's subjective complaints of pain and her obesity, supported greater restrictions. Doc. 6-3 at 18. In other words, the ALJ partially credited Simmons's complaints and adopted a more restrictive RFC than the State agency physicians thought necessary.

This record amply supports the RFC. *Moore v. Barnhart*, 405 F.3d 1208, 1213 (11th Cir. 2005); *Graham v. Bowen*, 790 F.2d 1572, 1575 (11th Cir. 1986). Simmons's three objections, addressed below, do not change that conclusion.

## II.   Dr. Moore's Opinion

Simmons first argues that the ALJ improperly rejected the opinion of her treating chiropractor. Doc. 9 at 2. In February 2024, Dr. Moore completed a medical source statement and a clinical assessment of pain form. Doc. 6-11 at 96-97. She opined, among other things, that Simmons could sit for five hours and stand or walk for four hours in an eight-hour workday; required a walker to ambulate; could rarely climb, balance, bend, stoop or reach; would miss work more than three times a

month; and would be off task twenty percent of the workday because of distracting pain. *Id.*

The ALJ considered this opinion and found it unpersuasive because "the reported limitations are completely inconsistent with the claimant's physical examinations, minimal to mild imaging, and treatment history." Doc. 6-3 at 17-18. He also correctly noted that a chiropractor is not an "acceptable medical source" under the regulations. *Id.* (citing 20 C.F.R. § 404.1502(a)). Simmons concedes that point but responds that the ALJ never summarized the opinion and that other records document her difficulty walking, such as her reports that her legs would give out, her limping and hobbling gait, and her use of a rollator. Doc. 9 at 7-10.

The ALJ was not required to recite Dr. Moore's opinion line by line; he needed only to consider it and explain why he found it unpersuasive, which he did. *See Mitchell*, 771 F.3d at 782; 20 C.F.R. §§ 404.1520c(b), 416.920c(b). And his rejection of the evidence Simmons cites because of its inconsistency is supported by substantial evidence, including repeated examinations showing a normal gait, normal strength, sensation, and reflexes, and full or normal range of motion; minimal-to-mild imaging of her spine, knees, and hips; conservative treatment with medications, injections, compression hose, chiropractic adjustments, and home exercise; and Simmons's own statements reporting that adjustments cut her pain from nine to two, that she did not use an assistive device at home, and that her back

12

pain had occurred only occasionally over the past six years. *Supra* at 6-11. That some evidence points the other way does not permit reversal, for the Court may not reweigh the evidence. *Dyer*, 395 F.3d at 1210. And because the ALJ permissibly discounted Dr. Moore's opinions about Simmons's potential absences and off-task distractions, he was not required to include them in the RFC.

### III.    Dr. Peterson's Opinion

Simmons next argues that the ALJ mishandled Dr. Peterson's opinion and, if he found it wanting, should have asked her for clarification or a function-by-function assessment. Doc. 9 at 10-12.

The ALJ did not reject Dr. Peterson's opinion; he found it "somewhat persuasive." Doc. 6-3 at 16. He explained why he did not credit it further: the opinion offered no function-by-function assessment; it framed Simmons's limits, such as her inability to perform "quick, intricate movements," in terms the Dictionary of Occupational Titles does not define; and the overall record of normal imaging, conservative treatment, and unremarkable examinations supported a limitation to light work rather than something more restrictive. *Id.* at 16-17.

Nor did the ALJ breach his duty to develop the record. An ALJ has a basic obligation to develop a full and fair record. *Cowart*, 662 F.2d at 735. But the claimant bears the burden of proving that she is disabled and of producing evidence to support her claim. *Colon v. Colvin*, 660 F. App'x 867, 870 (11th Cir. 2016). Further

13

development is unnecessary where, as here, the record contains sufficient evidence for an informed decision. *Id.* The ALJ had years of treatment notes, repeated imaging, Dr. Peterson's examination findings, the State agency consultants' assessments, and Simmons's testimony. *Supra* at 6-11. Simmons identifies no evidentiary gap in that record and no resulting unfairness, and remand for further development requires a showing of prejudice. *See generally* Doc. 9. In any event, Dr. Peterson's examination findings—such as Simmons's normal reflexes, sensation, and muscle bulk and tone, alongside some reduced strength and a slowed gait—do not clearly compel limitations beyond those imposed by the ALJ.

## IV.    Dr. Passman's Opinion

Simmons last argues that the ALJ mischaracterized the March 2023 treatment plan of Dr. Passman, the vascular specialist who examined her at the UAB Vein Clinic. Doc. 9 at 12-14. That plan called for Simmons to be "measured and fitted for 20-30 mm compression hose to be worn all day (on in the morning and off at night), leg elevation 2 times per day with active ROM of ankles and feet and walking or non-weight bearing calf muscle exercises, weight loss." Doc. 6-11 at 25-26. Because the vocational expert testified that a need to elevate the legs twice a day would eliminate all work, Simmons contends that the ALJ's refusal to treat leg elevation as a functional limitation requires reversal. Doc. 9 at 12-14.

The ALJ addressed this argument directly. He found that the leg-elevation instruction "is not a functional limitation and was only offered as part of a range of things the claimant could do to help with her symptoms including compression socks, exercise, weight loss, and elevating her legs." Doc. 6-3 at 17.  That reading is reasonable. A "medical opinion" is a statement about what a claimant can still do despite her impairments and whether she has impairment-related limitations in her ability to perform the demands of work activities. 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2). Dr. Passman's plan says nothing about work. It prescribes a regimen of self-care—including compression hose, elevation, exercise, and weight loss—to manage Simmons's swelling, and nothing in it states that she must elevate her legs during working hours or that she cannot work without doing so. *See* Doc. 6-11 at 25-26. Indeed, on Simmons's reading, the same sentence would also impose weight loss and calf exercises as workplace restrictions. The ALJ declined to read those therapeutic recommendations as workplace limitations, and he was reasonable in doing so.

Simmons's fallback argument, that the vein clinic's examination findings are themselves inconsistent with light work, Doc. 9 at 13-14, fails for the same reason as her other objections. The ALJ acknowledged those findings, including her hobbling gait, protruding varicose veins, edema, and daily pain, and weighed them against her normal pulses, range of motion, strength, sensation, and motor function

at the same visit, as well as the evidence from her other medical examinations. Doc. 6-3 at 17; *see also supra* at 6-11. Choosing between reasonable readings of the medical evidence is the ALJ's task, not the Court's. *Lacina v. Comm'r, Soc. Sec. Admin.*, 606 F. App'x 520, 525 (11th Cir. 2015).

In sum, the ALJ applied the correct legal standards, considered the record as a whole, and explained his evaluation of each medical opinion Simmons identifies. Even if the evidence could also support a more restrictive RFC, that possibility is immaterial: where substantial evidence supports the ALJ's determination, the Court must affirm.

### CONCLUSION

Substantial evidence supports the ALJ's denial of Simmons's applications for disability benefits and supplemental security income, and the ALJ applied the proper legal standards. The Court therefore **AFFIRMS** the Commissioner's decision.

**DONE** and **ORDERED** this 16th day of July, 2026.

**EDMUND G. LACOUR JR.**
UNITED STATES DISTRICT JUDGE

16